This is an atypical sitting for us, as some of you may know, when we had Storm Hurricane Harvey, we reallocated cases and so forth, some of which we converted, and then others, many of the lawyers were affected by the hurricane, so this is a special sitting, if you will. So we're a little time-challenged in terms of being in New Orleans in this space, but appreciate the cooperation of counsel as we reset the cases. I'm privileged to sit this morning with Judges King and Jones to hear these cases. I believe in looking at it, all of you are familiar with the usual rules. The main one is to keep your voice up in the microphone, one, because we record these things and if you don't talk up, we can't hear it, and, of course, your primary purpose here is to answer our questions, so please do that as forthrightly as you possibly can. All right, first case up is United States v. Ganji and Davis. Mr. Marcus, you're up. Thank you, Your Honor, and may it please the Court, and thank you for rescheduling this argument so quickly in light of the hurricane. As the Court knows, the heart of any conspiracy is an agreement, and there must be proof in this case that Dr. Ganji agreed with someone to violate the law. Here, not one witness testified that Dr. Ganji agreed with anybody. You know that it's boilerplate conspiracy law, and we get tons of cases where there's no evidence of an overt agreement, whatever. You know our boilerplate law says a person doesn't have to know all the ingredients, etc., etc., etc., so would that be in the heartland terrain, what you may argue differentiating your client from that sort of heartland premise? Sure, and absolutely. There can either be proof of an overt agreement, which is one type, or inferentially can there be arguments about inferentially can you infer an agreement, and here there's no evidence on that as well. What the government tries to inferentially argue that there's an agreement is, first, that Dr. Ganji was one of these go-to doctors. They use that term 14 times in their briefing in two separate argument headings, but it's a term that is made up by the government. They asked that question of three different witnesses, of Dee Temple, who said that she had seven different go-to doctors, not one of them was Dr. Ganji. The agent, Agent Bradford, then said she's heard that term before in general in these types of cases, and finally, Nurse Davis said, never heard of it in this case. Would you please tell us what was the structure of the prosecution? In other words, what witnesses testified against these defendants? Sure, so there were employees of CHHC, doctors who testified, a nurse who testified, there was a number of people who testified as statistician. No one testified specifically about Dr. Ganji. Well, let me just try to home in on it a little bit more. So there were no patients who said, I signed up, but I never got services? Correct. None of these other doctors, as I understand it, have been associated directly with CHHC. Correct. Is that correct? Correct. So there's no direct evidence of a misdeed by Dr. Ganji? That is correct, Judge Jones, that's correct. And so what we're left with is certain arguments like Dr. Ganji didn't see the patients before she certified them. That's one of the main arguments in the government's brief. Of course, that's not evidence of a conspiracy, even if true, but more importantly, it's based on a false premise that she had to have seen the patients face-to-face before certifying them. The rules are very clear that she need not, and it's certainly not evidence of a conspiracy anyway. One of the main arguments in the government's brief and at trial were that there were these 93 blank forms that Dr. Ganji signed at the bottom. And they argue that this is evidence of fraud. This is one of their main arguments. And the reason this doesn't prove a conspiracy is because, well, a couple of reasons. One, there's no evidence that when it was ultimately filled out by CHHC that any false information was put on the blank forms. So what the government would have had to show is that Dr. Ganji signed those blank forms knowing that CHHC would fill it out fraudulently or falsely, and that just didn't happen. By the way, there's a case very, very similar to this one from your sister circuit, the 11th Circuit, United States v. Wilner, at 795 F. 3rd 1297. And in that case, Dr. Abreu, the 11th — Did you put that in your brief? Yes, Your Honor. It's in our brief. And in that case, very, very similar fact pattern where the 11th Circuit vacated a conviction for Dr. Abreu, a 2015 case, where Dr. Abreu was asked to go fill out the files and, what the government said, alter them. And what the court said is, unless there's evidence that there was false information put in the files, you can't infer guilt because she went into the files and altered them. Did Dr. Ganji testify at trial? She did, Your Honor. Did she — I hadn't read her testimony, obviously — but did she testify with respect to, say, this home health and other instances that her standard practice, in other words, was that she signed a form, she did this. In other words, did she give testimony suggesting that what she did here was similar to what she's done, you know, otherwise? Or did she have any past history of doing these home healths? So yes, she had a practice where she certified patients for home health and came and started working at CHHC. The blank form issue took up a very small percentage of the overall patients, 93 out of the many hundreds that she had certified. If I could turn quickly to Count 4, which is a substantive count, this Carolyn Stewart patient, all of the evidence regarding Count 4 shows that this patient, in Dr. Ganji's mind, needed home health. It's not a question of whether she was actually homebound or not. The question is, did Dr. Ganji believe she was homebound? Was there any evidence about what was wrong with Ms. Stewart? I think there was, right? Absolutely, Judge. There was a 2,200-page file showing all of her ailments, including that she had a broken ankle. Well, now wait a minute before you get too exercised about it. Supposedly, her treating physician testified, right? This is critical. Her treating physician testified that, in her opinion, she was not homebound because she rode her bike to meet the treating physician. The problem was that riding of the bike happened in 2016. The indictment talks about a certification back in October to December of 2013. There was no indication in the file that Ms. Stewart had ridden her bike or anything else that would show she was not homebound. In fact, Dr. Ganji decertified her, did not re-up her for home health when she recovered from her ankle surgery, and in fact, also noted in the file that she had a vitamin D deficiency and recommended that she get follow-up. It was clear that Dr. Ganji was reviewing the file carefully and was certifying her based on those 2,200 pages that were there. This is so important because the question is not at the end of debate about whether Ms. Stewart was homebound or not. The only question is, did the doctor, Dr. Ganji, believe she was homebound? I don't think that's what the law ... What's your citation? Because the Medicare regulations are pretty clear about what's supposed to be homebound. If a doctor can only, quote, believe someone is homebound, I'm not sure that's sufficient. For there to be a criminal violation, she would have had to knowingly certify her knowing that she was not homebound. In other words, if she in good faith certified this woman believing she was homebound and it turned out she wasn't, that's not a crime. She was just like the other patients that Dr. Ganji did not personally see, but she relied on a nurse practitioner. Is that what you're saying? Absolutely, Your Honor. Thank you. My time is up. I had a lot more to say, but I'll be back in a few minutes. Thank you. All right. Thank you, sir. You've reserved your rebuttal time. All right. Mr. Larson. May it please the court, to use your language, Judge Jones, there was no direct evidence of a misdeed by Elaine Davis either. There were 18 government witnesses called at this case, and the government was unable to produce a single piece of direct evidence against Elaine Davis. No doctor testified that Elaine Davis participated in any agreement of any kind with them or about any criminal conduct by her, or even that Elaine Davis had knowledge of any criminal conduct. The reality of home health care is that not every fraud in home health care reaches all the way to the top. And the government could not accept the reality that in this instance, the fraud in this case, and there was fraudulent conduct by different doctors. Those doctors testified, but that fraud... So why weren't they indicted? They were indicted in other cases. In other cases? In other cases. They were not... It was a prosecutorial decision, and they weren't included in this conspiracy. And when had they been referring patients to CHHC? They were referring patients during the time span that would have been covered by the other indictments. In fact, it was the fact that Dr. Murray was indicted that caused Elaine Davis to fire him, and that's why he was terminated. When she learned that he had been indicted for home health care fraud, she terminated him immediately. What we have in this case is the government has attempted to paint this picture of a fraud orchestrated by Elaine Davis, relying on circumstantial evidence. But the inferences that the government would have this court draw are either not justified by the evidence, or they are just flatly unreasonable. First, Elaine Davis didn't have this own set of doctors. She never hired her own set of doctors. Elaine Davis didn't hire any of these doctors. She left medical decisions to people who were qualified to make them. And these rubber stamp doctors, and that's the government's term, didn't bill $34 million for services that were never provided. The government did not show a single instance at this trial of a service that was not provided. And remember, the government had over 1,700 patients that it could choose from, because that was Christian's entire patient base, that it could choose from and cherry pick four that it said, well, these patients weren't homebound. The jury rejected three of those patients out of hand. And the fourth patient, it was clear that Elaine Davis had nothing to do with that patient. And the biggest misrepresentation of all by the government, and it did it knowingly and intentionally, was that it misused the national average for episodes of care, which is an accumulative figure for Christian over seven and a half years. And it said to the jury, look, here's the average for episodes of care, and look at what Christian did. Well, that number was four times as great, naturally, because we're dealing with seven and a half years. The fact is, Christian Home Healthcare was ranked 27th in Louisiana in terms of the average number of episodes of care. Does that make the other 26 companies guilty of fraud automatically? And it is only... It makes the government guilty of defrauding the taxpayer with using our money. I would agree with that. But it is only if you believe the government's mantra in this case, which is home healthcare is not designed to be a long-term solution, it's only if you believe that mantra that you start to look at the case that way. But that's a position that is not justified by Chapter 7 of the Medicare regulations. It's not justified by the CFRs, and it's not justified by statute. Yes, Elaine Davis paid referral fees. She did so because she believed it was legal. Actually, Judge Englehart instructed the jury as to the circumstances under which it was legal to pay referral fees. And you have to remember, this was not a case involving kickbacks. It wasn't an anti-kickback statute case. They were never charged in the indictment. So what does that leave this court with? Well, it certainly doesn't leave it with a conspiracy with Dr. Ganji, which is what she was convicted of. She'd only spoken to Dr. Ganji at most twice in her life. And I understand that circumstantial evidence is what is available if you are going to prosecute conspiracies. Not everybody writes the conspiracy down, but the inferences we draw have to be reasonable and they have to be justified. And what we had in this case was a very talented group of prosecutors who specialize in prosecuting health care fraud who came in and painted this sea of fraud and then they put Elaine Davis in the middle of it and they said, oh, she's the head of this company, she must have known what was going on. Was the company still functioning or was it shut down? It was shut down the day the government came in, unannounced, and they seized all of the bank accounts, they seized all of the records, and they threw every one of the patients out on the street. And I asked the FBI agent, what was your plan of care for all of the patients of Christian? Her response, what plan of care? That was the government's approach to this case. The only possibility in this case is that home health care has a structure where the people who are closest to the patients can commit fraud, they can doctor their notes, and then as you go up the chain of supervision, you believe that what is happening beneath you by your employees... What did the lower people get out of this fraud? They are paid on a per patient visit by the company, and so they were getting their biweekly paychecks. That's what they got. They were able to make a living by defrauding... What were they defrauding about? You have said that all the services were provided, so is the fraud in the agencies having handled patients who were not eligible for home health care? Is that why you're not eligible at all, but somebody went out and took their temperature and their blood pressure every other week or so? They were certified as eligible. The nurses treating them knew that they were not eligible. That's the woman who worked for Dr. Murray at one time. That's correct, Your Honor. I see that I'm out of time. Thank you. You reserved your rebuttal time, Mr. Larson. All right. Ms. Harris. Good morning, and may it please the Court. Amanda Harris on behalf of the United States. I'd like to begin by responding to a couple of the allegations that there are misrepresentations in our brief and at trial. The first is that services were not provided. The testimony of two nurses, Lula Hendricks and Kimberly Celestine, both testified that no skilled, or generally speaking, skilled services were not provided because the vast majority of their patients weren't homebound. They could leave their home or they could perform the services that were being provided for them on their own. So how come they continue to work for the agency? The nurses, Your Honor? Yes, sir. Yes, ma'am. The nurses were not only getting their monthly salary, which they depended upon, but they were also receiving referral fees from Mrs. Davis of $100 per patient. So the more patients that they recruited, the more money that they could make. I don't remember that being a big point in your brief. It's in there, though. Yes, Your Honor. I would point to the team spirit contest as well, in addition to the referral fees. The team spirit contest was orchestrated by Mrs. Davis, where she advertised prizes and trips to Vegas, those sorts of things. Lula Hendricks testified to this during her testimony. Let me just say to you, what struck me about this case, in distinction with all of the other Medicare fraud cases, and the government is to be commended for pursuing fraud, there are no patients testifying. Normally there will be a bunch of patients testifying. The bonuses are minimal. I mean, I'm not sure about this referral fee, but the bonuses are minimal. The amount of money that Dr. Ganji got out of this was $1,000 per month, which is a pittance compared to the other fraud schemes. Mrs. Davis and her entire family worked for the agency, and they collected a million dollars over something like five years for four family members. Again, that's a pittance compared to the millions that are involved in these other schemes. Why not go after them in a civil way instead of trying to put her in prison? Your Honor, I'd have two responses. First, the question is not how does this compare to other fraud schemes. It's whether the evidence was sufficient to support the jury's verdict. Well, that may be, but if you can convict on progressively less evidence incriminating the particular defendants, then that's a bad thing. Let me address Your Honor's question this way, then. I'll identify, I think, what are the six best pieces of evidence against Dr. Ganji, and then I can identify some additional ones as to Mrs. Davis. I'll go through them briefly, and then I'll try to flesh them out for the Court. But you don't deny that, generally speaking, these people got less, you know, very little money themselves out of this alleged gigantic fraud? Your Honor, I agree that perhaps the $1,000 a month is not great, but it's a lot for doing nothing. The allegation is that she is signing off on blank forms. Additionally, Your Honor, Dr. Ganji, as well as the other doctors, gained access to Medicare beneficiaries for which they could bill Medicare Part B. For example, with the 93 face-to-face forms that were blank, Dr. Ganji billed Medicare Part B more than $300,000 for services that were not provided. Now, you say 93 blank forms, you say services not provided. You have to prove all that. Your Honor, the blank forms were recovered from the... Yeah, but you have to, I mean, I sort of agree with him. Blank forms is one thing, but was there false information on the forms? Your Honor, Dr. Ganji was signing these forms without any information. Not only is she... Did she testify to that? I'm sorry? Did she testify that she was signing blank forms without any information, or was it information that was gleaned from, you know, a nurse practitioner who went out and saw the people? That was her theory. The case with the jury rejected, Your Honor, but... Well, it's either fact, it's either what she testified to, and it's either contested or not. So, you're saying you contest that? Of course, Your Honor. We contest that she was actually supervising Nurse Kuji, and the evidence that shows that she wasn't, in fact, supervising Ms. Kuji and reviewing her notes, first, the government subpoenaed 286 records from Dr. Ganji. She never produced 56 of those records, meaning she had no records for 56 patients for whom not only... Back up a step, and so before you start unrolling the evidence, but as to, I'm going to ask you this about both Ganji and Davis, but since we're on Ganji, tell me succinctly, just real short, what the government's theory of the case was relative to her, and then tell me, you know, what the bing, bing, bing evidence was of that, particularly as related to this concert of action theory. Yes, Your Honor. The government's theory was that Christian was employing doctors under the guise of medical directors. That would be Dr. Ganji, Dr. Murray, and Dr. Kirkpatrick, all of whom testified at trial. Instead of providing those services, they were certifying patients for home health care. The reason they were doing this is because Mrs. Davis was recruiting patients from her employees. No, I understand the theory of the fraud prosecution itself, but I'm trying to hone in on what the theory of the case was vis-a-vis Dr. Ganji, and then I'll get to Davis in terms of the conspiracy, because I otherwise, in looking, didn't see sort of any predisposition, no prior connections with this operation. You know, obviously, there's no direct evidence, so it's difficult, a little hard to understand what the theory of the prosecution was against Ganji, putting aside that there's this conspiracy over here, there's bad stuff, or misdeeds. What's the theory of her being in the midst of that, since we don't have direct evidence? I mean, what did you hone in to prove that, as Judge Jones adverted, we don't have patients testifying, so what was it? For example, Your Honor, Government Exhibit 133, that's Dr. Ganji goes from certifying zero patients in 2009 to certifying 26% of Christian's patients in 2010, when she's hired as medical director. She consistently certifies about a third of Christian's patients, which is more than 100 patients per year. Why does that prove criminality, though? Your Honor, because as soon as she's hired as medical director, she starts certifying patients. And then the rest of the evidence Isn't that what a medical director is supposed to do? No, Your Honor. Leon Dodson testified that, generally speaking, home health care operates as getting patients from their primary care doctors, people who are familiar with the patient. A medical director isn't supposed to be hired to refer patients or sign up. But Medicare doesn't prohibit that, does it? Your Honor, there's not a direct... I mean, I'm not saying this is good, but what I'm saying is just that Medicare doesn't prohibit operating the home health care agency that way. I mean, if I go to the hospital, the doctor who takes care of me no longer takes care of me in the hospital because there is a hospitalist, and I don't like that either, but that's the way it works. Your Honor, but that's not what was occurring in this case. They were hiring... Who's Leon Dodson? Leon Dodson was the government's expert witness who testified about the Medicare rules. Well, that's just like a, you know, that, okay, fine. That's like the drug wit, you know, the DEA agent saying this is the way they do it in drug conspiracies, right? She was explaining the Medicare rules and what is permissible under Medicare, how home health care is supposed to operate. But it's not impermissible to have the medical director certify the patients, is it? It's impermissible if they are certifying patients in exchange for money and without seeing the patients, and that's what was occurring in this case, Your Honor. It may have been a closer case if there was any evidence that Dr. Gangi was... So if she certified 100 patients in a year and she was getting $1,000 a month, that means she was getting, at most, assuming she did nothing else, you know, $120 per patient. Your Honor, not only that, that's correct, but not only that, she's getting access to these beneficiaries who are Medicare beneficiaries. She then, in turn, bills Medicare Part B for services... Services not rendered? Not rendered. For example, Your Honor, all of these... How did you prove that? Your Honor, there is... That's not part of a conspiracy anyway. That would have been grounds for a separate Medicare fraud, not for conspiracy with Elaine Davis, which is all that you have against Gangi. Your Honor, that's not a separate conspiracy, respectfully. This is all a part of the same conspiracy. Ms. Davis is getting patients from her employees. She needs doctors to certify them. She finds doctors like Dr. Gangi, Dr. Murray, Dr. Kirkpatrick. But the conspiracy, you didn't have Murray and Kirkpatrick as unindicted conspirators, did you? Your Honor, that's not required. I know that, but the only conspiracy you tried to prove was Gangi and Davis. No, Your Honor, I disagree. For example, there was an agreement clearly between Dr. Murray and Ms. Davis. Ms. Davis brings Dr. Murray into her office and hands him a stack of Form 485 certifying individuals for home health care for patients for whom he had not seen and did not know the status of their condition. She also offers to pay him money for signing those. He's already been indicted and I think convicted or pled, so he's testifying. Dr. Gangi and Ms. Davis are both testifying. They're not taking the fifth about these circumstances, right? Yes, Your Honor, and all the credibility determinations are drawn in favor of the jury's verdict. And here, the jury rejected— But you don't prove a—how do you prove a conspiracy between A and B if you—when the only actual evidence of conspiracy—and you'll get to your six pieces, I'm sure—is between A, C, and D? Your Honor, in part, one of the things is that Dr. Gangi is acting the same way that both of the testifying doctors, who were also medical directors, were acting. For example, Dr. Murray testified that he signed but did not date Medicare forms. Dr. Gangi did the same thing. She signed but did not date Facebook— So this is basically 404B against—with the evidence of customer practice being the evidence against another person. No, Your Honor, it's not 404—I'm not sure which part you're— Well, it's you trying to use customer practice of one admitted fraudster against somebody who's not a fraudster. Your Honor— Who's not proven to be a fraudster. The—Dr. Gangi was proven to be acting fraudulently. Why don't you get to that evidence, because I'm sorry I keep interrupting. That's okay, Your Honor. Let me finish by explaining how she was acting like the other doctors, and then I'll continue on to the rest of the evidence. She was signing forms that were blank, undated. Those were recovered from her office. Not only was she signing those forms, bearing that patients were homebound, but that they were under her care. She doesn't have files for a large majority of those—or, she has no files for 56 of the 286 patients she certifies. She has 200 files for some of those patients—200 patients, I'm sorry—with no indication that she has reviewed any of the records, Mrs. Coogee's or anyone else's notes, showing that she's—the inference being she's unfamiliar with the patients. She only has 30 files, which have any of her own personal notes. Additionally, Your Honor, I would point the Court to Government Exhibit 29. That's Dr. Ganji's personnel file at Christian. She spoke with a person at Christian in 2015 at the end of the conspiracy. She says that she's been looking at the rules, and she has to be able to show that she's reviewed notes prior to certification. She then asks for a list of patients that she's certified for Christian and how—and patient notes, quote, just in case she needs to show how she is providing oversight, suggesting she doesn't know who she's certifying. That's nonsense. How many doctors can remember, if they're taking care of hundreds of patients, how many are going to recall every person's name? Your Honor, the point isn't that she has to be able to recall them. It's that she doesn't have record of them in her office because she's just signing off on documents without actually reviewing them. She doesn't have her own notes at all. Well, how many doctors provide—I mean, when you say her own notes, doctors have been required to keep all their notes in computer files for about 10 years now. So how do you— Dr. Ganji did not have her own notes in computer files, either. There's no—she does have to be able to—she is certifying these people for home health care. So basically what you're trying to say is that the medical director is required to be the primary caregiver for the patient who's certified, and do Medicare regulations require that? Medicare regulations require that if you're certifying someone for home health care, you have to be— I mean, I know that's what they aspire to, but do they require that? Medicare requires that when you certify someone for home health care, that the patient is under your care, that the person needs skilled services, and that the patient is homebound. In fact, on the face-to-face form, it asks for the reasons that a patient is homebound. And Dr. Ganji can't just sign off on that because the records—she is the one who has to make the medical determination as to why. But I go back again to this business about the nurse practitioner. Medicare does not prevent any doctor from going through a nurse practitioner to make that certification. Is that not correct? Your Honor, Medicare requires that the doctor— Does answer me yes or no. It does not—I can't even talk to my own doctor anymore, in many cases, without going through the nurse practitioner. And the doctor relies on what the nurse practitioner does. Now, this is in private practice. Does Medicare prohibit that? Prohibit the supervision of— Prohibit the doctor relying on a nurse practitioner when the doctor fills out these forms. No, Your Honor, but that's not what happened in this case. Well, that's the point. In this scenario, though, if—and in looking at it where the rules do allow, other than the direct doctor, you know, patient, but is the evidence that if a doctor relies on someone else, that somewhere on that form or otherwise the doctor has to certify that they are relying on someone else as the nurse practitioner, is there an affirmative requirement under the rules that even if the doctor doesn't personally do it, they've got to aver that they are relying on the other person's certification? Your Honor, I'm not sure how to answer your question exactly. What the forms that—these Medicare forms say, the doctor has to make the certification that someone is homebound. Although they can be looking at notes from a nurse practitioner, the doctor, him or herself— I'm not trying to make it complicated, but the reality, the way it is briefed and so forth is that a doctor must personally do it. End of story. If you don't personally do it, king's X. But in fact, the language does allow someone other than the doctor, you know, to do it. I mean, it's flat there. So if that's the case, the question is, can the doctor do it but without—but affirmatively averring on it? In other words, you can't just sign the blank form and say somebody else did it because it's the doctor who's certifying it. And I'm trying to understand if that was the theory of the prosecution, since obviously the evidence shows the doctor did not personally do it, and you're not helping me understand how that's criminal. It's criminal, Your Honor, if Dr. Gangi is not actually supervising Cynthia Coogee. If she's not actually reviewing the notes, she is the one who has to make the home health care certification. She's the one who has to fill in the form to say that someone is homebound, the reasons why they are homebound. That's a medical determination that has to be made by a physician. It says that on the form itself. So Ms. Dotson's testimony, the government's witness, does she lay all that out? Yes, Your Honor, she does. And the forms themselves also— Did Ms. Coogee testify? Ms. Coogee, the nurse practitioner? Right. No, Your Honor, she did not testify. Any single—aside from—I mean, even Ms. Stewart didn't testify, right? So not a single patient testified that they were not homebound at the time that they were receiving services, correct? There were patients who testified, although they were related to the acquitted counts, so no, Your Honor, with regard to Dr. Gangi, no. Right. However, this case is more than about just homebound, whether or not patients were homebound. Although the testimony was that the vast majority of these patients were not homebound. That was from both nurses, both testifying doctors, all of whom testified that the vast majority of these Christian patients were not homebound. But additionally, Your Honor, it was that Dr. Gangi didn't know who she was certifying for home healthcare. They have to be under her care. Not only is she averting that they're homebound, but also that they're under her care. All right, shift gears here a minute and talk to Davis. Madam Clerk, give the government lawyer another two minutes and three minutes, and then I'll add a bit of time on the defense side on it. But shift to Ms. Davis, because we've spent all the time about Dr. Gangi, but a lot has  been said about her. So there's no direct evidence on Davis, no doctor testified about her guilty knowledge. So what's your best evidence in terms of her? Your Honor, I don't think it's correct that no doctor testified about her guilty knowledge. Dr. Murray testified that she had him come into her office and offered to pay him money to sign forms after he had already been terminated as a medical director. His testimony is at record 2542. He testified she has him come into her office, hands him the stack, he signs them all, doesn't date them. Christian fills them out later and bills Medicare more than $200,000. That's not grounds for conspiracy, which is what the only thing she's charged and convicted with, right? Your Honor, I believe that is evidence of the conspiracy, because... With Gangi. But she's also charged with others. The indictment, and as well as, putting Gangi aside, the indictment says others, as well as the jury instructions, that's record on appeal number 4513 and 4191. Both of those, both the indictment and the jury instruction says others. I believe there's a Supreme Court case, Rogers v. United States, 340 U.S., 367. Co-conspirators aren't even required to be named, and so when you're saying others, this does relate to some of the testifying folks from Christian. Another direct piece of testimony against Ms. Davis is Samantha McGee's testimony. Samantha McGee, as you'll recall, was an office assistant, eventually, for Christian. When she was being interviewed by Ms. Davis, Ms. Davis brings her into her office for the interview. Instead of asking Ms. McGee about her qualifications, Ms. Davis immediately asks whether Ms. McGee can bring in patients from another home health care company. As it came out on cross-examination, that company was fraudulent based on Mark Morad, who ran that company. When Ms. McGee notified Ms. Davis that some of those, that those, I'm sorry, the home health care company from which she was coming had some doctors who they were working with to certify these patients, Ms. Davis said, don't worry about it. We have her own set of doctors, identifying sort of this group of doctors that she, that she's relying on. That's what's incriminating about that. That she has her own set of doctors. Yeah, well, which could mean that we'll independently certify them, and if they're not, I mean, I don't see why that necessarily says we're going to do the same fraud that the other people did. It's not beyond reasonable to ask. I believe that goes with the testifying doctor's testimony who were testifying that they were certifying patients, rubber-stamping patients for home health care, both through one-time office visits as well as pre-signing patients. Where's that at the record? I'm sorry. Where's, you have a record site for Ms. Davis's answer? I don't want to sandbag you, but. For Ms. McGee, for two Ms. McGee? Yeah, Ms. McGee. That's record 3255, Your Honor. Okay, thank you. The last sort of, I think, best evidence against Ms. Davis is the evidence of the referral fees. Generally, she held this team spirit contest, as I mentioned earlier, and she also paid employees $100 per patient. That comes from Kimberly Celestine and Lula Hendricks as well as Ms. McGee. Ms. McGee testified that 100% of the patients that were being referred were being certified by Christian. That showed two things. One, it showed why Ms. Davis needed her own set of doctors, her own words, and two, it showed that Ms. Davis either knew or was deliberately ignorant, and there was a deliberate ignorance instruction, and not knowing that every single patient that was being referred by employees could have possibly been homebound, and that went to her knowledge as to the fact that she was paying, billing Medicare for non-homebound patients. I see that my time has expired. I'm happy to answer any further questions, but if the Court has no other questions. All right. Thank you. We'll read the full record. Thank you, Your Honor. Thank you. All right. Mr. Larson, I've given, I mean, Mr. Marcus, I've given you, put six up there. I gave the government three, so give him six and give Mr. Larson to cover the ground here. Thank you, Your Honor. May it please the Court. I'd like to start with this idea that because Dr. Ganji started certifying patients when she worked at CHHC, that that's somehow fraud, that it went from 0% to 26% at government's review of three. And I think this is the main problem with the government's argument. They assume guilt based on certifications. Certifications by themselves in a vacuum is not fraud. What the government must prove is that these patients were ineligible when they were certified, and that Ganji knew they were ineligible. The fact that Ganji started to certify patients when she became medical director at CHHC... I'm not relying on, you know, her PA or somebody else. Okay. What's all the blank forms, et cetera, et cetera? Very important, Your Honor. So for the 93 out of the many hundred where there's a blank form, she relied on her nurse practitioner, which is permitted by Medicare. She's... And I presume she testified to that to the jury. Yes, and so did the government witnesses admit that a nurse practitioner is permitted to... Her testimony was when she signed, knowledge she didn't personally believe. She relied on the nurse practitioner, and was it her test... Her certification of all these people was based on the information gleaned from the nurse practitioner. Yes, Your Honor, and so that it's clear, on those 93 forms, attached to those blank forms are the nurse practitioner notes, which are initialed by Ganji. And this is critical. They're then given to CHHC, and they are filled out correctly based on what's in those notes. They're... Wait a minute. The blank forms have attached to them the notes? Yes, Your Honor, and this is so important. In other words, all that we're talking about here is a record-keeping debate between the government and the defense. The doctor in this case, on a very small percentage, didn't fill out all the identifying information in the face-to-face form. Instead, what she did was she clipped the nurse practitioner notes to them, initialed the nurse practitioner notes, and CHHC filled out those 93 forms with the information that was attached. No fraud is alleged with the information that was filled out. Nothing illegal or fraudulent is on those 93 forms to show, A, false information, or B, that the patients were ineligible. And I think the best example of this is Carolyn Stewart, count four. This was a blank form piece. Dr. Ganji, not only, you can see, reviewed the nurse's notes by signing them, but she makes a notation in the file, and this is so important, that Carolyn Stewart had a vitamin D deficiency, and please send her in for follow-up, which is direct evidence that she reviewed it, looked at it, noticed the deficiency, and said, come on in so that we can address this. So important to show that there was no fraud here, that Dr. Ganji was reviewing the nurse practitioner notes, signing them, finding issues, and attaching them. So when I read the record and I get to Dr. Ganji's direct testimony, if it hadn't occurred or otherwise, we'll find you taking Dr. Ganji through the process, what she knew, yada yada, the notes attached, et cetera. So that's what I'll read. Absolutely, Your Honor, and it's not just from her direct. It was undisputed from the government agent who put in that file that her signature was on the bottom of those, on those nurse notes, and that ultimately the blank form that she signed on this small percentage of cases was filled out accurately. Medicare could revise its regulations to disallow certifications by nurse, or reliance on nurse practitioners, could it not? Absolutely, Your Honor, and if this case shows anything, it shows that the government would like that to happen. But this case is not... Not a good idea to do it by criminal prosecution, though. Exactly, Your Honor, and that's really the point of this case. We've criminalized something that the government disagrees with. There's two other brief points here. One is they cite to Lulu Hendricks and Celestine, two nurses who said that services weren't provided. Critical here is that these two nurses weren't Dr. Ganji's nurses, and they were asked specifically, do you know anything about Dr. Ganji's patients? And what do they say? No, we had nothing to do with Dr. Ganji's patients, and we don't know whether they were eligible or not. So those two nurses who testified that way have nothing to do with Dr. Ganji. Finally, the last argument that the government made was that she acted in a way similar to Dr. Murray. Of course, this is exactly the type of evidence that courts do not allow for conviction, saying one defendant looks a lot like another guilty defendant. But here, she doesn't look anything like Dr. Murray. Dr. Murray came in after the fact and signed those forms, and here's what's important. Dr. Ganji was already working there. If there was a conspiracy between Elaine Davis and Dr. Ganji, Elaine Davis would have gone to Ganji and said, hey, we have all these forms. Let's fill them out. No, they were Dr. Murray's patients. She goes to Dr. Murray, not to Dr. Ganji, because there is no conspiracy between Elaine Davis and Dr. Ganji. My time's almost up. I'd just like to say, Dr. Ganji, I have gone through this record so much and the law so much. This is one of those rare cases where I'm up here arguing for someone who is innocent, and I believe that, and I would ask the court to review the government's arguments just because... You don't say that lightly. I don't, Your Honor. I don't say that lightly. She is an almost 70-year-old woman who was doing the best she could and never violated the criminal laws, and I'd ask the court to vacate her conviction and not expand criminal liability to disagreements with the Medicare rules. Thank you. All right. Thank you, sir, for your argument. Mr. Larsen? May it please the court, the government just told you that the vast majority of the patients at Christian were not homebound. Over 600 doctors and institutions, different doctors and institutions, made referrals to Christian. Were all of them sending people who weren't homebound to Christian? And the employees that they referenced, Celestin and Hendricks, I asked both of them specifically on cross-examination. Now, when you failed to provide services, or now you're testifying you failed to provide services, was there anything in your notes that reflected that? No. Did you ever tell Elaine Davis that you weren't providing these services? No, because they didn't communicate with Elaine Davis. They had a supervisor, and in one instance, one of them was supervising the other, and they were covering up for each other. Elaine Davis wasn't part of their little fraud. Okay. What about the referral fees? The referral fees, Your Honor, the contest, the infamous contest that the government dwells on, the flyer for the contest says as follows, patients will only be counted toward your total number if they are Medicare eligible and ready for immediate admission and services provided by Christian Home Health and Christian Hospice Services. That's the team spirit deal. What about $100 referral fees? She believed it was perfectly legal, and they were paid only to bona fide employees. And it's not illegal, is it? It's not illegal. And the $100, frankly, wasn't even the market rate for the city of New Orleans. That was a... You mean for referral fees? For referral fees. And the million dollars, Your Honor, if you divide that out by the number of Davises who worked there and the number of years for this conspiracy, it comes out to less than $20,000 a year. That's what the million dollars adds up to. What we have in this case, and the tax returns are in evidence. They were put there by Walter Davis, Jr. Some years this company made money. Some years this company lost money. This wasn't about greed. This wasn't the classic home health care rapacious company, people taking millions of dollars for things that weren't happening. Elaine Davis spent her life building this company. She worked for six years without a salary so that she could buy this company. It was a family business in every sense of the word. Elaine Davis, who has never been in trouble, one day in her life did her best to run a good home health care company. This is a difficult, difficult industry. And she was surrounded by people who, frankly, it doesn't draw the top of the medical profession in every instance, who may have been, for their own purposes, committing fraud, but she never joined in it. Isn't this the sort of post-Katrina time period where a lot of the providers who were doing this weren't available, etc., etc., so it's kind of in a time frame where there was a market, for want of a better word, for these services, etc.? Am I right, time frame-wise? Yes. Post-Katrina, home health care was basically some of the only medical services available. And the demographics for the New Orleans population, I was questioning Leanne Dodson about that. I said, well, did you look at the demographics for New Orleans to see how they were different? The number of patients admitted for psychiatric disorders in post-Katrina New Orleans was eight times the national average. You don't think that has an impact on the number of people for home health care? Well, this conspiracy was 2007 forward, right, or 2009? 2007, I believe, Your Honor. Yeah, okay. What we have is, and to talk about Murray, who now, after the fact, all of a sudden the government is saying, well, no, no, the conspiracy is with Murray, it really isn't with Ganji, well, that creates a problem with the conviction and the indictment. But the first time that Elaine Davis ever spoke to Dr. Murray in her life, and that's her testimony and his testimony, was when she called him to fire him. If that's the beginning of the conspiracy, it's off to a pretty rocky start. This instance in which they said, well, she told Dr. Murray to sign these forms. She called him into her office. Yes, she did, because these were forms for his patients. And he had neglected to sign them because he had been out of town for an entire month. They had sent two previous requests to Dr. Murray saying, Dr. Murray, you certified these patients as homebound. You need to sign your 485. He was out of town. He finally gets back. He finally gets called in, and he signs the forms for his own patients. And if you look at the forms, and had she fired him? Yes, because he'd been indicted. Was he still a doctor and eligible to certify patients for home health care? Absolutely. He was doing nothing wrong. In fact, he was doing exactly what the law required him to do. And then, finally, the government mentions McGee. But you don't say that as a legal matter, the conspiracy could have named Ganji, but in fact been with Murray, as, quote, others. I'm assuming that that is a possibility, but I'm not sure how it would play out. Did the government argue that? No, they simply argued this vast conspiracy, including these doctors that Elaine Davis was orchestrating, and the conviction they end up with is with Dr. Ganji, whom Elaine Davis has spoken to twice in her life. That's what the jury came back with. I see that I'm out of time. Thank you. Mr. Larson, you tried the case below? I tried the case. Mr. Marcus, you tried it below? You're in on appeal, right? Okay. All right, it was just a curiosity question, that's all. All right, thank you to all counsel for ably responding to the questions that the court has. It's obviously a big record, but we're going to read every tittle of it and figure it all out. So the case will be submitted. Thank you.